Argued and submitted June 4, decision of Court of Appeals affirmed, order of Board of Parole and Post-Prison Supervision reversed and case remanded to the Board for further proceedings December 9, 1999

## EDWARD CHARLES BOLLINGER,
*Respondent on Review,*

*v.*

## BOARD OF PAROLE
## AND POST-PRISON SUPERVISION,
*Petitioner on Review.*

(CA A83561; SC S43633)

992 P2d 445

Christine Chute, Assistant Attorney General, Salem, argued the cause for petitioner on review. With her on the brief on the merits were Theodore R. Kulongoski, Attorney

General, and Virginia L. Linder, Solicitor General. With her on the reply brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Andy Simrin, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the brief was David E. Groom, Public Defender.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

GILLETTE, J.

---

** Kulongoski, Leeson, and Riggs, JJ., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

This case arises out of a challenge to an order of the Board of Parole and Post-Prison Supervision (the Board) that advanced an inmate's scheduled parole release date. The order effectively prevented the inmate's discharge from prison under the statutory "good-time" scheme. The inmate objected to the order and sought judicial review. The Court of Appeals reversed, holding that the order violated the constitutional prohibition against *ex post facto* laws because it applied a statute that denies to prison inmates any right to refuse parole to an inmate who committed offenses before enactment of that statute.[1] *Bollinger v. Board of Parole*, 142 Or App 81, 87-88, 920 P2d 111 (1996).

The Board petitioned this court for review of that decision. We accepted review to consider the Board's argument that it *always* had authority to order an unwilling inmate onto parole and that, consequently, the Board's application of ORS 144.245(3) to the inmate could have no *ex post facto* effect. We hold that, until the enactment of ORS 144.245(3), a prison inmate could refuse parole, and the Board had no authority to override that refusal. We therefore affirm the decision of the Court of Appeals.

The following facts are not in dispute. The inmate was convicted of first-degree sodomy in October 1985 for conduct that occurred between November 1984 and February 1985. He received a 15-year indeterminate sentence with a five-year minimum term of incarceration. Shortly after he entered prison, the Board set his parole release date at October 26, 1990. Later, the Board deferred that release date by 12 months, based on a finding that the inmate suffered from an extreme emotional disturbance. In June 1991, when the Board again considered the inmate's case, it refused to set a parole date, noting that he had refused to participate in a psychological evaluation. Later in the same order, however, the Board directed that the inmate be released on parole two days before his good-time date. At the time of the order, the

---

[1] ORS 144.245(3) was adopted by the 1985 Legislature. Or Laws 1985, ch 53, § 3. It provides: "In no case does a prisoner have a right to refuse an order granting the prisoner release upon parole."

Department of Corrections (the Department) had assigned the inmate a tentative good-time date of October 27, 1995, based on the requirements of ORS 421.120(1).

On several occasions after the issuance of the June 1991 order, the Department informed the Board that the inmate's projected good-time date had advanced because he had earned additional meritorious good time. On each such occasion, the Board issued an order advancing the inmate's release date to two days before the updated good-time date—ultimately, to June 27, 1994. With its last release-date order, the Board indicated that the inmate would remain on supervised parole status until the expiration of his sentence.

The inmate requested administrative review of the last release-date order, arguing that the order effectively nullified his accumulated good time and extended his period of supervision beyond that which was in effect when he committed his crime. When the Board denied relief, the inmate sought review (on March 31, 1994) in the Court of Appeals under ORS 144.335. After the case was argued but before that court issued a decision, the Board withdrew the challenged order and issued an amended order. The amended order differed from the original order in two significant respects: (1) it provided for a minimum supervision period of only 12 months; and (2) it designated the inmate as a predatory sex offender under *former* ORS 181.507 (1993).[2] The inmate again sought administrative review. When the Board again denied relief, he filed an amended petition for judicial review under ORS 144.335,[3] on July 26, 1995, challenging both the imposition of parole and the predatory sex offender designation.

The Court of Appeals reversed. That court first considered, and then rejected, the inmate's contention that the Board lacked statutory authority to advance a parole date for

---

[2] The predatory sex offender statute is now recodified at ORS 181.585 *et seq.*

[3] ORS 144.335 was amended in 1995 to exempt from judicial review "any decision relating to a release date." Neither party has argued that that exemption applies retroactively to the order at issue, which became final and appealable and, in fact, was appealed, before the September 9, 1995, effective date of the amendment.

the purpose of avoiding a good-time release. However, it concluded that the inmate had a right to refuse parole under the statutes that were in effect at the time of his crimes and, therefore, that applying ORS 144.245(3) to the inmate to prevent his discharge on his good-time date increased the total time that the state has supervisory control over him, thereby violating the constitutional prohibition against *ex post facto* laws. *Bollinger*, 142 Or App at 87-88. The Board seeks our review of that decision.

The Board argues that this case presents no *ex post facto* problem because the inmate had no more right to refuse parole at the time of his crimes than he did after ORS 144.245(3) was enacted. In so arguing, the Board acknowledges that no statute expressly precluded an inmate from refusing parole before the enactment of ORS 144.245(3) in 1985. However, the Board contends that the pre-1985 statutes nevertheless establish that it could order an inmate on parole without regard to his or her wishes.

■■ Ultimately, the Board's petition poses the following question: Before the enactment of ORS 144.245(3), was a prison inmate entitled to reject the Board's decision to release him or her on parole? That is a question of statutory construction, to be analyzed according to the framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). *PGE* instructs us that, in attempting to determine what the legislature intended, we first must consider text and context. *Id.* at 610-11. We thus begin by examining the text and context of the parole statutes that existed at the time of the inmate's crimes, to see if the legislature can be said to have addressed the question before us.

The Board suggests that ORS 144.270[4] is dispositive of the question. That statute provides, in part:

"(1)　The State Board of Parole and Post-Prison Supervision, in releasing a person on parole, shall specify in writing the conditions of the parole and a copy of such conditions shall be given to the person paroled.

----

[4] Because ORS 144.270 has not been amended in any way that is relevant to the issue at hand since the time of the inmate's crimes, we quote the current version of the statute.

"(2)   The board shall determine, and may at any time modify, the conditions of parole, which may include, among other conditions, that the parolee *shall*:

"(a)   *Accept the parole granted subject to all terms and conditions specified by the board.*

(Emphasis added.) The Board contends that the emphasized wording indicates that inmates were required to accept whatever parole the Board granted.

The Board appears to acknowledge the existence of an alternative construction—that the mandatory wording pertains to the inmate's acceptance of *the terms and conditions* that the Board might attach to a grant of parole, *i.e.*, inmates must accept such conditions as a package, rather than attempting to pick and choose from among them. However, the Board contends that, properly construed, the statute authorizes the Board to require acceptance of the parole *itself*. The Board argues that the correctness of that latter construction becomes evident when the provision is read in the context of Oregon Laws 1973, chapter 694, the larger statute in which the legislature originally enacted ORS 144.270. In that regard, the Board notes that sections four, five, and six of that 1973 enactment set out various factors that the Board was permitted or required to consider in making parole decisions. Or Laws 1973, ch 694, §§ 4-6. Those factors, the Board notes, relate to issues such as public safety, rehabilitation, and deterrence, and do not accord any weight to the preferences of inmates.

We agree with the inmate, however, that the Board's suggested reading of the statute is highly unlikely. By its express terms, ORS 144.270(2) is directed to the determination and modification of *conditions* of parole. It permits the Board to *condition* parole upon the inmate's acceptance of the entire package of the Board's conditions. Even if an inmate might be said to have failed to satisfy that precondition by refusing to accept the entire package, that is still a far cry from expressing an intent that the Board be allowed to compel parole in the first instance.

Neither is the Board's construction of ORS 144.270(2) aided by the various related sections of the 1973 enactment upon which it relies. Those provisions do little to shore up the Board's theory. In particular, there is nothing inherently inconsistent in a scheme that requires the Board to ignore inmate preferences in its own parole calculations but still permits the inmate to refuse whatever terms of parole that the Board might choose to offer.

We return, then, to our examination of the text and context of the parole statutes for evidence of the legislature's intent with respect to the question at hand. In our view, there is one statute, ORS 144.050 (1983), that bears strongly on that question. That statute grants to the Board, in general terms, the power to parole prison inmates:

> "Subject to applicable laws, the State Board of Parole may *authorize any inmate,* who is committed to the legal and physical custody of the Corrections Division *to go upon parole* subject to being arrested and detained under written order of the board or as provided in ORS 144.350."

It is significant, we think, that the legislature framed the Board's power to grant parole in terms of "*authoriz[ing]* an[ ] inmate * * * to go upon parole." In ordinary parlance, "authorizing" an act is something quite different from commanding or ordering it. "Authorize" means to empower, sanction, or formally endow *another* with a right to act.[5] The word connotes choice on the part of the person authorized—to act or refrain from acting upon the authority granted. Thus, in granting to the Board the power to *authorize* inmates to go out upon parole, ORS 144.050 (1983) appears to contemplate that inmates will take an active role in determining whether that will occur. Although the statute

---

[5] "Authorize" is defined in *Webster's Third New Int'l Dictionary*, 146-47 (unabridged ed 1993) as:

"1a: to endorse, empower, justify, or permit by or as if by some recognized or proper authority * * *: SANCTION * * * 4a: to endow with authority or effective legal power, warrant, or right: appoint, empower, or warrant regularly, legally, or officially * * * b: to grant or allot by proper authority."

The same dictionary distinguishes "authorize" from other similar terms by stating that "AUTHORIZE indicates endowing formally with a power or right to act, usu. with discretionary privileges." *Id.* at 147.

charges the Board with determining whether to permit an inmate to go out upon parole, the *inmate* is left to act or refrain from acting upon that permission.[6]

The foregoing understanding of ORS 144.050 is confirmed, in our view, by the use of the term "parole" in ORS 144.050 and its antecedents, as well as other statutes that define the Board's obligations and authority. Historically, a parole was a promise, especially a promise to fulfill certain conditions in exchange for release from captivity or imprisonment. Although, now, "parole" also is used to refer to the release from imprisonment itself,[7] its promissory connotations still exist.[8] Thus, for instance, almost all the authorities that have considered the question have concluded that a parole requires the inmate's acceptance, including his or her affirmative promise to honor its conditions. *See, e.g., Ex Parte Peterson*, 14 Cal 2d 82, 92 P2d 890 (1939) (illustrating proposition).[9]

---

[6] It appears that the Board's power to parole always has been framed in similarly permissive terms. Before the adoption of the noted "authorize" wording in 1969, the statute provided:

"The state board of parole and probation shall have power to establish rules and regulations under which any prisoner * * * *may be allowed* to go upon parole outside the institution * * *."

Or Laws 1959, ch 101, § 1.

[7] For example, this court has defined parole, very briefly, as "a release from jail, prison or other confinement after actually serving part of the sentence." *State v. Ludwig*, 218 Or 483, 486, 344 P2d 764 (1959).

[8] For example, even now *Webster's Third New Int'l Dictionary* at 1644, defines "parole" as follows:

"1: WORD OF HONOR: plighted faith; esp: the promise of a prisoner of war upon his faith and honor to fulfill stated conditions (as to return to custody or not to bear arms against his captors) in consideration of special privileges, usu. release from captivity * * * 2. the state or period of freedom resulted from a parole * * * 4a: a conditional or revocable release of a prisoner serving an indeterminate or unexpired sentence in a penal or correctional institution—compare PROBATION [:] b: a release under similar conditions of one detained or kept in custody * * * 5: the release of a defendant in a criminal case on his own recognizance or in the custody of his attorney during the period between indictment and trial * * *."

[9] Many of the cases discuss the word "parole" in terms of its historical antecedents and its essential similarity to a conditional pardon. The following discussion from *Peterson* is typical:

"The word 'parole' was originally a military term signifying the word of honor or promise of a prisoner of war that if he be released, he will comply with certain conditions, such as to refrain from bearing arms against his captors. As used in penology, the term has come to signify the release of a prisoner prior to

The upshot of the foregoing discussion is that, when the inmate committed his crimes, ORS 144.050 provided, as it does now, that the Board "may authorize any inmate * * * to go out upon parole." That wording expressed a legislative intent that the Board would determine whether, when, and on what conditions an inmate may go out upon parole and that inmates would have a choice whether to accept and act upon the Board's decision. The 1985 Legislature expressed an entirely different intent when it adopted ORS 144.245(3), to the effect that inmates *cannot* reject parole. But, until the legislature adopted that statute, the law permitted an inmate to refuse parole and did not empower the Board to command parole in the face of such a refusal.

The Board suggests that a contrary intent may be derived from a more holistic analysis of the parole statutes that were in effect at the time of the inmate's crimes. In that regard, the Board points to persistent themes in those statutes—the Board's broad authority to decide the fate of inmates, *i.e.*, to set, ORS 144.120 (1983), to advance, ORS 144.122, to defer, ORS 144.125(3) (1983), and to refuse to set, ORS 144.120(4) (1983), release dates and to set the conditions of parole; its obligation to use its powers to protect the public and deter crime; and its more specific obligation to insure that all inmates spend at least six months on supervised parole after their release from prison, *former* ORS 144.310(1) and (2) (1983). The Board contends that, in view of those strong and persistent themes, it is impossible to believe that the legislature intended that inmates be permitted to nullify the Board's decision to grant parole by refusing to accept that parole.

Assuming that the foregoing statutes are relevant context for construing ORS 144.050, we are not persuaded that they assist the Board. All are about what the Board may (or should) do in particular circumstances. None negates the

expiration of his term of imprisonment conditioned upon his continuing good behavior during the remainder of the term. In its essential characteristics, therefore, a parole cannot be distinguished from a conditional pardon. Each constitutes a release of a convict upon fixed conditions before the expiration of his term of imprisonment and many courts have drawn upon this analogy to hold that a proffered parole must likewise be accepted to be effective."

14 Cal 2d at 85, 92 P2d at 891.

apparent thrust of ORS 144.050, as we have discussed it above. Moreover, to the extent that the Board is suggesting that that apparent meaning is too irrational to reflect the legislature's true intent, we disagree. One might argue about the merits of such a policy choice, but there is nothing inherently irrational in endowing the Board with broad authority to determine whether, when, and under what conditions an inmate may be paroled, while at the same time requiring voluntary acceptance of the parole and its conditions by an inmate.

Finally, the Board contends that, even if it could not require the inmate to go upon *parole* against his wishes under the statutes in effect at the time of his crime, it could have required him to serve the *equivalent* of a six-month period of parole, to begin upon his release on his good-time date, without offending *ex post facto* principles. In so arguing, the Board relies on *former* ORS 421.120(3) (1983), which appeared as part of the good-time statute and provided:

> "Except when granted by the State Board of Parole under ORS 144.310, a discharge of an inmate from a sentence imposed after July 21, 1981, upon a date determined under this section [*i.e.*, a good-time date], shall be upon the condition that the inmate be subject to a period of supervision in the same manner as a paroled inmate, except that the maximum period of supervision shall be six months and upon violation of the terms imposed upon the conditional discharge the maximum period of reincarceration shall be 90 days. However, the period of supervision, reincarceration or both shall in no case cause the length of the inmate's term to exceed the maximum term imposed by the court."

We agree that *former* ORS 421.120(3) (1983) was in effect at the time of the inmate's crimes and that it permitted (perhaps even required) the Board to impose a *limited* period of parole-like supervision on inmates who remained in prison until their good-time dates.[10] We also agree that, while that statute was in effect, the Board could order a maximum of six months of supervision without regard to any decision by an

---

[10] *Former* ORS 421.120(3) (1983) was enacted in 1981. Or Laws 1981, ch 425, § 2.

inmate to refuse parole, without offending the prohibition on *ex post facto* laws.[11] That being said, we do not see how the existence of *former* ORS 421.120(3) (1983) assists the Board in this case. That statute might have given the Board the power to impose *six* months of supervision on the inmate against his wishes, but it could not justify the *12*-month period of supervision that the Board imposed in the order at issue.

We conclude that, when the inmate in this case committed his crimes, an inmate could refuse parole and remain in prison in the hope of achieving unconditional discharge under the good-time statute. The Court of Appeals was correct, therefore, that ORS 144.245(3) represents a change in the law, denying to prison inmates a right to refuse parole that they previously had enjoyed.

The Court of Appeals concluded that: (1) ORS 144.245(3) withdrew a right to refuse parole that inmates previously had enjoyed; and (2) application of that statute to the inmate amounted to an *ex post facto* violation, because it increased the total amount of time that the state would have supervisory control over him. We agree with the first proposition and have no occasion to inquire into the second.[12]

The decision of the Court of Appeals is affirmed. The order of the Board of Parole and Post-Prison Supervision is reversed, and the case is remanded to the Board for further proceedings.

---

[11] *Former* ORS 421.120(3) (1983) was repealed in 1985, at the same time and in the same statute that enacted ORS 144.245(3), prohibiting prisoners from refusing parole. Or Laws 1985, ch 53, §§ 1, 3. In view of that history, it is at least arguable that the earlier provision bears some logical relationship to ORS 144.245(3), *i.e.*, that it represents an initial (but, later, rejected) legislative response to concerns about inmates refusing parole in favor of discharge under the good-time statute. If so, then it is notable that the legislature chose to attack the problem by requiring a brief period of supervision upon release on a good-time date, an approach that suggests an intent to leave intact the existing arrangement that allowed inmates to choose to remain in prison *until* their good-time dates.

[12] Normally, there would remain the question whether the Court of Appeals was correct in holding that application of ORS 144.245(3) to prevent the inmate's discharge under the good-time statute violates the constitutional prohibition against *ex post facto* laws. However, that is a question that the Board has not raised to this court and that it affirmatively conceded in its arguments to the Court of Appeals.